1

2

3

4

5

6

7

8             # UNITED STATES DISTRICT COURT

9                  ### EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  **GEORGE E. JACOBS, IV,** | **Case No.  1:10-cv-02349 AWI JLT (PC)** |
| 12         **Plaintiff,** | **FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 13       **v.** | |
| 14  **A.C. QUINONES, et al.,** | **(Doc. 124)** |
| 15         **Defendants.** | **OBJECTIONS DUE WITHIN 30 DAYS** |

16

17          In this action, Plaintiff asserts claims under Eighth Amendment claims against Defendants

18   Does #1-3, Pratt[1], Magana, and Davis for the conditions of his confinement via deprivation of

19   basic necessities; against Defendants Cogdill, Scaiffe, Quinones and Davis for excessive force;

20   and against Defendants Bardonnex and Williams for depriving Plaintiff of yard time.  (Docs. 11,

21   17, 19, 24.)

22          For the reasons discussed herein below, the Court **RECOMMENDS** that Defendants'

23   motion for summary judgment be GRANTED.[2][3]

---

24          [1] This Defendant was erroneously named as "Pruitt."

25          [2] In arriving at this findings and recommendations, this Court carefully reviewed and considered all arguments, points and authorities, declarations, depositions, exhibits, statements of undisputed facts and responses

26   thereto, objections, and other papers filed by the parties in regards to this motion.  Omission of reference to an argument, document, paper, or objection is not be construed to the effect that this Court did not consider the

27   argument, document, paper, or objection.
            [3] On January 30, 2015, Defendants Quinones, Barbonnex, Cogdill, Magana, Scaife, Williams, Pratt, and

28   Davis ("Defendants") filed a motion for summary judgment under Federal Rule of Civil Procedure 56, which contained a warning of the requirements for filing an opposition per *Rand v. Rowland*, 154 F.3d 952, 962-63.  (Doc.

1    **I.      Summary Judgment Standard**

2         Any party may move for summary judgment.  The Court shall grant summary judgment if

3    the movant shows that there is no genuine dispute as to any material fact and the movant is

4    entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

5    *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  A material fact is one that

6    may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby,*

7    *Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable

8    trier of fact could return a verdict in favor of the nonmoving party."  *Id.*  The Court determines

9    only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's

10   filings because he is a *pro se* prisoner.  *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010)

11   (quotation marks and citations omitted).

12        Each party's position, whether it be that a fact is disputed or undisputed, must be

13   supported by (1) citing to particular parts of materials in the record, including but not limited to

14   depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not

15   establish the presence or absence of a genuine dispute or that the opposing party cannot produce

16

---

17   124.)  On February 20, 2015, Plaintiff filed a request for a 30-day extension of time to file his opposition, which was
     granted on February 24, 2015.  (Docs. 128, 129.)  On March 11, 2015, Plaintiff's second request for an extension of
18   30-days' time was granted.  (Docs. 131, 132.)  On March 16, 2015, a Second Informational Order issued which
     advised Plaintiff of the requirements under Rule 56 to oppose a motion for summary judgment.  (Doc. 133.)  On
19   April 13, 2015, Plaintiff filed a third request for an extension of time and, on April 22, 2015, the Court granted him
     another 30-day extension of time to file an opposition.  (Docs. 138, 139.)  On May 11, 2015, Plaintiff requested a
20   fourth extension of time, this time for only 10 days, which the Court granted on May 18, 2015.  (Docs. 140, 141.)  On
     May 22, 2015, Plaintiff filed a motion under Rule 56(d) requesting a stay and or indefinite extension of his time to
21   file an opposition.  (Docs. 142.)  This motion was denied on June 9, 2015 without prejudice as Plaintiff failed to
     specifically identify relevant information that he did not have, his basis for believing that such information actually
22   exists, and how it would prevent summary judgment.  (Doc. 144.)  Plaintiff was ordered file an opposition or a
     statement of non-opposition within 30 days if he desired to be heard and was warned that once that last deadline
23   expired, the motion would be taken under submission -- regardless of whether Plaintiff had filed a response to the
     motion.  (*Id.*)  Plaintiff has failed to file an opposition or statement of non-opposition despite lapse of more than 30
24   days.
          Plaintiff's opposition was originally due on February 20, 2015.  Plaintiff has received extensions of time to
25   file totaling more than five months within which to file an opposition to Defendants' Motion.  Despite being warned
     in the order granting the last extension that the motion would be deemed submitted if he failed to file an opposition or
26   statement of non-opposition, Plaintiff has failed to do so.  Thus, the Court has taken the motion under submission
     without receiving any opposition by Plaintiff.  Local Rule 230(l).  Despite Plaintiff's failure to file an opposition or
27   statement of non-opposition, his verified First Amended Complaint may constitute an opposing affidavit for purposes
     of the summary judgment rule, and it will be considered as such where it is based on an Plaintiff's personal
28   knowledge of admissible evidence, and not merely on his belief.  *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir.
     1987) (per curium); Lew *v. Kona Hospital*, 754 F.2d 1420-1423 (9th Cir. 1985); F.R.C.P. 56(e).

1   admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The

2   Court may consider other materials in the record not cited to by the parties, but it is not required

3   to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026,

4   1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir.

5   2010).

6          Because Defendants do not bear the burden of proof at trial, in moving for summary

7   judgment, they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle*

8   *Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*,

9   477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden

10  then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues

11  for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).  This

12  requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing

13  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

14         In judging the evidence at the summary judgment stage, the Court may not make

15  credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509

16  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

17  inferences in the light most favorable to the nonmoving party and determine whether a genuine

18  issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

19  *City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted),

20  *cert. denied*, 132 S.Ct. 1566 (2012).  Inferences, however, are not drawn out of the air; the

21  nonmoving party must produce a factual predicate from which the inference may reasonably be

22  drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

23  *aff'd*, 810 F.2d 898 (9th Cir. 1987).

24         "A verified complaint may be treated as an affidavit to oppose summary judgment to the

25  extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence.'"

26  *Keenan v. Hall*, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996) (quoting *McElyea v. Babbitt*, 833 F.2d

27  196, 197-98 n. 1 (9th Cir. 1987) (per curiam)), *amended by* 135 F.3d 1318 (9th Cir. 1998); *see*

28  *also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203 F.3d 1122, 1132

1   n. 14 (9th Cir. 2000) (en banc); *Schroeder v. MacDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *Lew*,

2   754 F.2d at 1423.  If the plaintiff states that the facts in the complaint are true under penalty of

3   perjury, the pleading is "verified."  *Schroeder*, 55 F.3d at 460 n. 10.  A verified complaint in a *pro*

4   *se* civil rights action may constitute an opposing affidavit for purposes of the summary judgment

5   rule, where the complaint is based on an inmate's personal knowledge of admissible evidence,

6   and not merely on the inmate's belief.  *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987)

7   (per curium); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).

8           Despite receiving multiple extensions of time to do so, Plaintiff failed to file an opposition

9   to the pending motion.  However, Plaintiff's First Amended Complaint is verified, (*see* Doc. 11),

10  and, therefore, the Court will consider it to the extent allowed in evaluating Defendants' motion.

11  **II.     Plaintiff's Cognizable Claims[4]**

12          The First Amended Complaint describes a series of incidents that Plaintiff asserts

13  occurred while he was on "management status" in the Secured Housing Unit 4A at Corcoran State

14  Prison. (Doc. 11, 1stAC.)  Plaintiff is proceeding in this action on three claims under the Eighth

15  Amendment:  (1) against Defendants Does #1-3, Pratt, Magana, and Davis based on the

16  conditions of his confinement for deprivation of basic necessities by exposing him to freezing

17  temperatures and constant lighting (24/7) for 30 days; (2) against Defendants Bardonnex and

18  Williams for depriving him of outdoor yard time for 44 days; and (3) against Defendants Cogdill,

19  Scaiffe, Quinones, and Davis for excessive use of force.  (*See* Docs. 11, 17, 24.)

20  **III.    Defendants' Motion**

21          **A.  Conditions of Confinement**

22                  **1.  Legal Standards**

23          The Eighth Amendment protects prisoners from inhumane methods of punishment and

24  confinement.  *Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v. Morgensen*, 465 F.3d 1041,

25  1045 (9th Cir. 2006).  Thus, no matter where they are housed, prison officials have a duty to

26

27  _____
    [4] This is only a very general summation of Plaintiff's allegations on the claims that were found cognizable.
    Individual material facts are discussed where applicable in the following sections.

28                                              4

ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted).  To establish a violation of the Eighth Amendment, the prisoner must "show that the officials acted with deliberate indifference. . . ." *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. May 1, 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002).

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer* at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id*. at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995).

Objectively, extreme deprivations are required to make out a conditions of confinement claim and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations and quotations omitted).  Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets. *Wilson*, 501 U.S. at 304-05(comparing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day), with *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) (outdoor exercise not required when prisoners otherwise had access to dayroom 18 hours per day)).  Further, temporarily unconstitutional conditions of confinement do not necessarily rise to the level of constitutional violations. *See Anderson*, 45 F.3d 1310, *ref. Hoptowit*, 682 F.2d at 1258 (*abrogated on other grounds by Sandin*, 515 U.S. 472 (in evaluating challenges to conditions of confinement, length of time the prisoner must go without basic human needs may be considered)).

If an objective deprivation is shown, a plaintiff must show that prison officials subjectively acted with a sufficiently culpable state of mind -- that of "deliberate indifference."

*Wilson*, 501 U.S. at 303; *Johnson*, 217 F.3d at 733.  In other words, a prison official is liable for

inhumane conditions of confinement only if "the official knows of and disregards an excessive

risk to inmate health and safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Farmer*, 511 U.S. at 837.  Further, the plaintiff must show that the defendant officials

had actual knowledge of the peril to a plaintiff's basic human needs and deliberately refused to

meet those needs.  *Johnson*, 217 F.3d at 734.

### 2. Cell Temperature

#### a. Plaintiff's Allegations

Plaintiff alleged that Defendant Magana, the Control Officer, would turn up the cold air

vent in his cell, (Doc. 11, at p. 10), and that he was subjected to an in-cell temperature that was

"cold and freezing being that Plaintiff was denied clothing and linen to wrap or warm himself

with" (*id.*, at p.11).  Plaintiff alleges he was forced to sleep in a cold cell on the bare concrete

floor for over 30 days.  (*Id.*, at p. 9.)  According to Plaintiff, these conditions "are solely

controlled by the control tower officer, M. Magana who was aware and had visual knowledge of

Plaintiff's living conditions."  (*Id.*, at p. 10.)  Plaintiff informed Defendants Pratt and Does #2 and

#3 of the conditions of his cell and his need for medical care, but they did nothing for him.  (*Id.*,

at p. 11.)  Ten days into his confinement on management status, Plaintiff allegedly also told

Defendant Doe #1 of all the problems he was having and Defendant Doe #1 told Plaintiff he

would look into it, but never returned.  (Doc. 11, at p. 15.)  Plaintiff also alleged that Defendants

Davis was aware of these conditions.  (*Id.*, at pp. 9, 14.)

#### b. Defendants' Facts

Defendants respond by presenting evidence that Plaintiff was put on Property Restriction

Status for thirty days beginning September 12, 2007, because he used sheets and towels to

barricade himself in his cell.  (Doc. 124-1, at p. 13; Doc. 124-4, DUF No. 38.)  Plaintiff was not

allowed anything that he could use as a barricade or to cover his cell door or windows, (*id.*), and

thus only had one pair of boxer shorts, one T-shirt, one pair of socks, shower shoes (flip-flops),

one mattress, and one blanket, (Doc. 124-1, at p. 13; Doc. 124-4, DUF No. 39).  Plaintiff also had

toilet paper, a toothbrush, and toothpowder.  (Doc. 124-1, at p. 13; Doc. 124-4, DUF No. 40.)

During this 30-day Property Restriction, Plaintiff was allowed to exit the cell to shower three

times a week, (Doc. 124-1, at p. 13; Doc. 124-4, DUF No. 41), and was taken out of his cell to go

to the registered nurse and the mental health doctor, (Doc. 124-1, at p. 13; Doc. 124-4, DUF No.

42).

Defendants respond to Plaintiff's claims that the temperature in his cell was "freezing,"

(Doc. 124-1, at p. 14; Doc. 124-4, DUF No. 67), by showing that the temperature settings are

controlled by plant operations technicians -- not by any of the Defendants in this action.  (Doc.

124-1, at p. 14; Doc. 124-4, DUF No. 69.)  Plaintiff's cell was the same temperature as the other

cells in the unit.  (Doc. 124-1, at p. 14; Doc. 124-4, DUF No. 68.)  Ventilation is provided to the

cells by a supply vent and an exhaust vent.  (Doc. 124-1, at p. 14; Doc. 124-4, DUF No. 70.)  The

supply vent provides a continuous flow of air, but does not forcefully "blow out air."  (*Id.*)  The

consistent rate of flow is 110 cubic feet per minute (CFM), which is the output of a typical

household bathroom fan.  (*Id.*)  The same air is supplied to the dayroom and the cells at the same

time.  (Doc. 124-1, at p. 14; Doc. 124-4, DUF No. 71.)  It is not possible for the heating and

cooling system to heat the dayroom while supplying the cells with "freezing cold air."  (Doc. 124-

1, at p. 14; Doc. 124-4, DUF No. 72.)  The temperature of the cells can be one or two degrees

different than the dayroom, but it is impossible for the cells to be freezing cold at the same time

that the dayroom is warm.  (Doc. 124-1, at p. 14; Doc. 124-4, DUF No. 73.)

Defendants further show that, between September 12, 2007 and October 12, 2007, the

temperature in Plaintiff's cell was consistently warmer than 67° (+-2°) and only dipped to 67° on

one day at 6:00 a.m.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 74.)  Thus, Defendants argue

that the ambient temperature recorded from September 12, 2007 to October 12, 2007, would not

subject Plaintiff to a substantial risk of serious harm to his health.  (Doc. 124-1, at p. 15; Doc.

124-4, DUF No. 75.)  Finally, Defendants note there is no evidence in Plaintiff's health records

that he suffered serious harm or risk of harm, due to the temperatures recorded September 12,

2007 to October 12, 2007.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 76.)

///

7

### c. __Analysis__

Defendants' evidence shows that the temperature in Plaintiff's building had a recorded high of 80° at a few times on one day (Doc. 124-11, at p. 5) and recorded at a low of 67° at 6:00 a.m. one day (*id.*, at p. 30), but the vast majority of the time between September 12, 2007 and October 12, 2007, the temperature registered in the mid-70s (*id.*, at pp. 5-36). Defendants submitted medical evidence to show that the temperature of Plaintiff's cell did not pose a substantial risk of serious harm to Plaintiff and that Plaintiff did not experience any untoward effects from the temperature in his cell. (Doc. 124-7, pp. 4-5.) Thus, Defendants met their burden of showing that the temperature of Plaintiff's cell for which he complains did not meet the objective prong of posing a substantial risk of serious harm to Plaintiff's health. Since the temperature did not amount to a substantial risk of serious harm to Plaintiff's health, knowledge by Defendants Pratt, Quiones, and Does # 1-3 without ameliorative action, as Plaintiff alleges, did not violate Plaintiff's rights.

Further, Defendants have shown that the cells and the dayroom in Plaintiff's unit are supplied heated and/or cooled air by only one Heating/Ventilation/Air Conditioning unit that circulates air of one temperature to all of the cells and the dayroom in one fell swoop. (Doc. 124-11, at p. 2.) Ventilation is provided to the cells by a supply vent that provides a continuous flow of air at the rate of output of a typical household bathroom fan. (*Id.*) The central HVAC unit is controlled by a computer which can only be changed by a technician utilizing specialized knowledge, a laptop computer, and access to a computer that is inaccessible to correctional officers and inmates. (*Id.*)

When resolving a claim under the Eighth Amendment against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988) *citing with approval Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a

1    duty -- possessed of authority and means -- to prevent the injury.")  Defendants evidence shows

2    that the temperature in Plaintiff's cell did not fall within any of the Defendants' means or

3    discretion such that they did not violate Plaintiff's rights under the Eight Amendment based

4    thereon.  Thus, the Court finds that, as to Plaintiff's claim that Defendants Magana, Pratt, Davis,

5    and Does #1-3 were deliberately indifferent to Plaintiff's need for warmth in his cell, Defendants

6    have met their initial burden of informing the Court of the basis for their motion and identifying

7    admissible evidence to demonstrate the absence of a genuine issue of material fact.

8            The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material

9    fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

10   (1986).  As stated above, in attempting to establish the existence of a factual dispute on this point,

11   the First Amended Complaint may be utilized to the extent it is based on Plaintiff's personal

12   knowledge of admissible evidence, and not merely on his belief.  *McElyea*, 833 F.2d at 197-98;

13   *Lew*, 754 F.2d at 1423; F.R.C.P. 56(e).  As to the temperature within his cell, Plaintiff only

14   alleges that it was "freezing" and "cold."  The First Amended Complaint does not specifically

15   quantify in degrees the temperature in Plaintiff's cell of which he complained, nor does it explain

16   upon what he was basing his terms of "freezing" and "cold" aside from his impression of the

17   temperature he perceived via his skin.  Plaintiff may have perceived his cell as being freezing

18   cold, but his perception does not qualify as evidence of an objective element that was likely to

19   cause him harm.  Further, while Plaintiff alleges a number or symptoms that he attributes to the

20   conditions of his confinement, including the temperature of his cell, his allegations fail to show

21   that he is qualified to opine that the temperature of his cell in the timeframe in question caused

22   any medical sequela.  Fed. R. Evid. 701, 702.  Given the sparsity of amenities provided while on

23   property restriction, it is understandable that Plaintiff may have perceived the temperature to have

24   been lower than it actually was, but this is not admissible evidence to show that the temperature

25   was anywhere near "freezing" (32°).

26           Finally, even if Plaintiff could objectively prove that the temperature in his cell was so

27   cold as to pose a serious risk of harm to Plaintiff's health, Plaintiff's pleading contains no

28   evidence of a subjective intent and/or desire by any of the Defendants to affect the temperatures

9

in Plaintiff's cell. Plaintiff's allegations in the First Amended Complaint that Defendant Magana controlled the temperature in his cell are his mere conclusions without evidentiary support, and are not admissible evidence in opposition to Defendants' motion.  *See McElyea*, 833 F.2d at 197-98; *Lew*, 754 F.2d at 1423; F.R.C.P. 56(e).  Thus, Defendants are entitled to summary judgment on Plaintiff's claim that his rights under the Eight Amendment were violated when he was subjected to freezing temperatures in his cell between September 12, 2007 and October 12, 2007.

### 3. Cell Lighting

#### a. Plaintiff's Allegations

Plaintiff alleged that Defendant Magana, the Control Officer, kept the lights on constantly for the 30 days he was on "management status." (Doc. 11, at pp. 10, 24-26.)  Plaintiff informed Defendants Pratt and Does #2 and #3 of the conditions of his cell and his need for medical care, but they did nothing for him.  (*Id.*, at p. 11.)  Ten days into his confinement on management status, Plaintiff alleges also that he told Defendant Doe #1 of all the problems he was having and Defendant Doe #1 told Plaintiff he would look into it, but never returned.  (Doc. 11, at p. 15.)  Plaintiff also alleges that Defendant Davis was aware of these conditions.  (*Id.,* at pp. 9, 14.)

#### b. Defendants' Facts

Defendants respond that the Control Booth Officer cannot turn on or off the lights in an individual cell.  All cell lights in the unit are controlled by the same master switches.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 78.)  The Control Booth Officer can turn off all the lights in all the cells, but this is not allowed, due to safety and security reasons.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 79.)

The electrical lighting in Plaintiff's cell, 4A1R-26, consists solely of four florescent tubes in a ceiling-mounted bank: three 32-watt fluorescent bulb for the normal, daytime light; and one 13-watt, PL-13 fluorescent bulb for the night security-light.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 80.)  At 10:00 p.m. the bright lights are turned off and the night lights are turned on in all the cells in the unit.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 81.)  The night lights are left on in all the cells in the unit during bedtime for safety and security reasons.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 82.)

10

The night light in cell 4A1R-26 puts out 1.0 foot-candle (10.8 lux) of light.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 83.)  Exposure to 10.8 lux of light at nighttime would not subject Plaintiff to a substantial risk of serious harm.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 84.)  Assuming it was kept on during nighttime sleeping hours September 12, 2007, to October 12, 2007, Defendants note there is no evidence that Plaintiff suffered serious harm to his health from the nightlight.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 85.)

### c. Analysis

Plaintiff alleges that the lights, for the 30 days he was on management cell, were constantly illuminated.  Plaintiff's allegations also do not address any differing illumination strength/brightness between the lighting in his cell during day and night -- only that they were constantly illuminated.  Defendants respond to these allegations by acknowledging that the lights *were* constantly illuminated, but at different lighting levels depending on the time of day/night.  Plaintiff's allegations in the First Amended Complaint do not contradict Defendants' evidence in the least.  Further, it is not uncommon for average households and/or hotel rooms to have a nightlight on in hallways and/or sleeping quarters during the night and it cannot be said that giving Plaintiff similar conditions amounts to a violation of the Eighth Amendment.

Also, sleep deprivation appears to be a necessary element/allegation for success on claims of constant illumination.  *See Chappell v. Mandeville*, 706 F.3d 1052, 1057-58 (9th Cir. 2013) (comparing Chappell's allegations regarding illumination on seven days of contraband watch without allegations of sleep deprivation to allegations of sleep deprivation over a period of six months in *Keenan v. Hall*, 83 F.3d 1083, 1088, 1090-91 (9th Cir. 1996)).  Though the First Amended Complaint contains allegations that Plaintiff's mental state was less than stable, he does not allege that he was sleep deprived because of the illumination of his cell.  Likewise, he does not connect his mental status specifically with the illumination levels in his cell rather than the other restrictive conditions, which are a normal part of incarceration.  (*See* Doc. 11.)  Moreover, there is no showing that Plaintiff has sufficient training and expertise to would allow him to offer a medical opinion.  On the contrary, Defendants support their motion with a declaration from Dr. Barnett who opines that Plaintiff was not subjected to a substantial risk of serious harm to his

1  health due to the nightlight.  (Doc. 124-7, ¶¶6-8.)

2        Finally, Defendants submit evidence that the lighting in cells are controlled by master

3  switches and that the Control Booth Officer (Defendant Magana in this case) was able to turn all

4  of the cell lights off or on but that the lights in an individual cell cannot be individually

5  controlled.  (Doc. 124-4, DUF ## 78, 79.)  Also, the evidence shows that the nightlights must

6  remain on for safety and security reasons and the Control Booth Officer is not permitted to turn

7  these lights off.  *Id.*  Plaintiff's allegation that Defendant Magana controlled the lighting in his cell

8  appears to be his mere conclusion rather than having evidentiary support.  *See McElyea*, 833 F.2d

9  at 197-98; *Lew*, 754 F.2d at 1423; F.R.C.P. 56(e).  Defendants evidence shows that the lighting in

10  Plaintiff's cell at night was neither in Defendant Magana's control nor his discretion such that he

11  did not cause a violation of Plaintiff's rights under the Eight Amendment based thereon.  *Leer*,

12  844 F.2d at 633-34.

13        Thus, Defendants have met their burden of showing there is no material dispute of fact

14  regarding whether the illumination of Plaintiff's cell while he was on management status violated

15  the Eighth Amendment and Plaintiff's allegations in the First Amended Complaint fail to raise a

16  genuine dispute.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim

17  that the illumination in his cell while he was on management status violated his rights under the

18  Eight Amendment.

19        **4.  Outdoor Exercise Yard**

20        **a.  Plaintiff's Allegations**

21        Plaintiff also alleged that Defendants Bardonnex and Williams falsified records to deprive

22  him of yard time for 44 days by skipping his cell at yard time, but documenting that Plaintiff was

23  refusing yard time.  (Doc. 11, at p. 13.)

24        **b.  Defendants' Facts**

25        Plaintiff claims Defendants Williams and Barbonnex denied him outdoor exercise for 44

26  days, from September 12, 2007, to October 26, 2007.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF

27  No. 62.)  But Defendants Bardonnex and Williams did not have authority to issue orders

28  regarding Plaintiff's participation in yard time.  (Doc. 124-1, at p. 15; Doc. 124-4, DUF No. 64.)

Defendant Williams only worked eleven days in Plaintiff's housing unit during the 44-day period in question (9/14/07, 9/15/07, 9/21/07, 9/22/07, 9/28/07, 09/29/07, 10/5/07, 10/19/07, 10/20/07, 10/26/07 and 10/27/07).  (Doc. 124-1, at pp. 15-16; Doc. 124-14, at p. 2; Doc. 124-13, at pp. 67-73.)  Defendant Bardonnex only worked four days in Plaintiff's housing unit during the 44-day period in question (09/14/07, 09/15/07, 09/21/07, and 09/22/07).  (Doc. 124-1, at p. 16; Doc. 124-14, at p. 2.)  The prison records demonstrate Plaintiff refused to attend the exercise yard on 14 days during the 44-day period in question (9/14/07, 9/21/07, 9/25/07, 9/26/07, 9/28/07, 10/2/07, 10/3/07, 10/5/07, 10/9/07, 10/17/07, 10/19/07, 10/23/07, 10/25/07 and 10/26/07).  (Doc. 124-1, at p. 16; Doc. 124-4, DUF No. 63.)

### c. <u>Legal Standards</u>

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations and quotations omitted).  In order to state a claim for violation of the Eighth Amendment, Plaintiff must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm to him.  *E.g.*, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010).  Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment.  *Thomas*, 611 F.3d at 1151-52.  However, "a prisoner's right to outdoor exercise is neither absolute nor indefeasible . . ."  *Norwood v. Vance*, 591 F.3d 1062, 1068-69 (9th Cir. 2010), and "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation," *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (denial of outdoor exercise for 22 days was temporary and insufficient to state a claim absent adverse medical effect).

///                                                          13

### d. **Analysis**

Defendants' evidence shows that there were only two days that Defendant Bardonnex worked on which Plaintiff was noted to have refused yard (09/14/07 and 09/21/07) and there were only six days that Defendant Williams worked on which Plaintiff was noted to have refused yard (09/14/07, 09/21/07, 09/28/07, 10/05/07, 10/19/07, 10/26/07).  Two of the days where Plaintiff was noted to have refused yard overlapped the days that both Defendants Williams and Bardonnex worked (09/14/07 and 09/21/07).  Thus, of the days that Defendants Williams and Bardonnex worked from September 12, 2007 through October 26, 2007, Plaintiff was noted as refusing yard time only a six times -- on 09/14/07, 09/21/07, 09/28/07, 10/05/07, 10/19/07, and 10/26/07.  Six days of missed exercise yard out of a forty-four day period, is a temporary situation and is not significant enough to pose a substantial risk of serious harm.

Even assuming that missing six days of outdoor exercise is actionable—and the Court <u>does not</u> hold that it is—Plaintiff's own opinion that he sustained medical effects from the conditions he complains of in this action, as previously discussed, are insufficient since he is not qualified to opine the medical causation of his symptoms.  Fed. R. Evid. 701, 702.   Thus, the Court recommends Williams' and Bardonnex's motion be **GRANTED**.

### 5. **Excessive Force**

#### a. **Plaintiff's Allegations**

Plaintiff alleges that he filed a "602 grievance" about his cell conditions and Defendant Scaife interviewed him about it later.  (Doc. 11, at p. 15.)  Plaintiff claims that "sometime after" his interview with Defendant Scaife, Defendant Cogdill assaulted him with a broomstick and Plaintiff endured two hours of continuous pepper spray by Defendants Cogdill and Scaife.  (*Id.*) He claims further that Defendants Quinones and Davis were present during the pepper spray incident.  (*Id.*)

#### b. **Defendants' Facts**

Defendants' evidence presents a much different picture.  Defendants' evidence shows that on September 12, 2007, at approximately 7:45 a.m., during breakfast tray retrieval, Plaintiff stabbed an officer (who is not a defendant in this action) with an improvised spear-type weapon

1   through the food port in his cell door.  (Doc. 124-1, Def. MSJ, p. 10; Doc. 124-4, DUF No. 5.)

2   Simultaneously, Plaintiff grabbed a paper cup of yellow liquid—presumably urine--and threw it

3   at that officer through the food port, hitting him in the hip area, a crime known as "gassing."

4   (Doc. 124-1, at p. 10; Doc. 124-4, DUF No. 6.)  Plaintiff attempted to gas that officer a second

5   time, but missed.  (Doc. 124-1, at p. 10; Doc. 124-4, DUF No. 7.)  That officer exited the section

6   and notified Defendant Scaife of the incident.  (Doc. 124-1, at p. 10; Doc. 124-4, DUF No. 10.)

7   Defendants Scaife and Cogdill arrived at the location and ordered Plaintiff to submit to

8   handcuffing.  (*Id.*)  Plaintiff nodded his head as though he was willing to comply.  (*Id.*)  But when

9   Defendants Scaife and Cogdill approached the food port, Plaintiff tried to spear Defendant Scaife,

10   and struck him in his left sleeve.  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 11.)  In response,

11   Defendants Scaife and Cogdill deployed and emptied their canisters of O. C. pepper spray into the

12   cell.  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 12.)  Next Plaintiff blocked the food port to

13   prevent the officers from shutting it and, hence, preventing further assaults.  (Doc. 124-1, at p. 11;

14   Doc. 124-4, DUF No. 13.)  Defendant Cogdill used a broom handle to push Plaintiff away from

15   blocking the food port. [5]  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 14.)  Plaintiff was not

16   injured by the use of a broom handle to force him away from the food port.  (Doc. 124-1, at p. 11;

17   Doc. 124-4, DUF No. 15.)

18   Once the food port was secured, Defendants Scaiffe and Cogdill exited the section.  (Doc.

19   124-1, at p. 11; Doc. 124-4, DUF No. 16.)  Before they returned with the extraction team,

20   Plaintiff made a barricade in his cell by hanging sheets completely across the front of his cell,

21   shielding himself from view.  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 17.)  Plaintiff also

22   clogged the toilet and flooded the floor of his cell with water, (Doc. 124-1, at p. 11; Doc. 124-4,

23   DUF No. 18), and wrapped wet towels around his head, (Doc. 124-1, at p. 11; Doc. 124-4, DUF

24   No. 19).

25   For reasons of safety and security, the prison personnel determined it was necessary to use

26

27   _____

[5] Defendant Cogdill contends that Plaintiff blocked the food port with a towel and a piece of sheet.  (Cogdill Decl. ¶3.) At his deposition, Plaintiff testified that he blocked the food port with his body.  (Pl.'s Dep. 17:8-14,18:8-19,19:2-4.)  Defendants contend this contradiction does not raise a genuine issue of fact because either way, Plaintiff

28   admitted that he blocked the food port and that force was required to clear it.

15

1    pepper spray to force Plaintiff's compliance with removal from the cell rather than attempting to

2    rush into the cell and physically overpower him.  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 22.)

3    Before the pepper spray was deployed, Dr. Sanchez gave medical clearance to use it against

4    Plaintiff.  (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 20.)

5            At approximately 09:15 a.m., L. Scott, a Licensed Psychiatric Technician, performed a

6    clinical intervention by going to Plaintiff's cell door, requesting that he comply with orders to cuff

7    up and warning him that force would be used if he did not comply.  (Doc. 124-1, at p. 11; Doc.

8    124-4, DUF No. 21.)  Defendant Quinones, the Incident Commander, went to Plaintiff's cell door,

9    ordered him to cuff up, and warned him that the officers would use force if he did not comply.

10   (Doc. 124-1, at p. 11; Doc. 124-4, DUF No. 13.)  During Defendant Quinones' warning, Plaintiff

11   came out from behind his barricade of sheets, listened for a few seconds, turned away, adjusted

12   the sheets to make sure his barricade was secure and then retreated behind the barricade, pulling

13   the sheets closed behind him.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 24.)

14           Before deployment of the pepper spray into Plaintiff's cell, the ventilation system was shut

15   down and the smoke purge system activated in unit 4A4L.  (Doc. 124-1, at p. 12; Doc. 124-4,

16   DUF No. 25.)  Officers then repeatedly deployed pepper spray into Plaintiff's cell.  (Doc. 124-1,

17   at p. 12; Doc. 124-4, DUF No. 26.)  Between deployments of pepper spray, an officer went to

18   Plaintiff's cell door and ordered him to cuff up, but he repeatedly refused to do so.  (Doc. 124-1,

19   at p. 12; Doc. 124-4, DUF No. 27.)  Between deployments of pepper spray, officers waited

20   several minutes to allow the pepper spray to take effect and to allow Plaintiff to comply with the

21   orders to cuff up.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 28.)

22           The deployment of pepper spray into Plaintiff's cell did not have a full or immediate effect

23   on him because: 1) he was barricaded behind sheets; 2) he had wet towels wrapped around his

24   head; 3) there was water on the floor; and 4) the smoke purge system was activated.  (Doc. 124-1,

25   at p. 12; Doc. 124-4, DUF No. 29.)  After multiple deployments of the pepper spray into his cell,

26   Plaintiff complied with Defendant Scaife's order to come to the cell door and cuff up.  (Doc. 124-

27   1, at p. 12; Doc. 124-4, DUF No. 30.)  Plaintiff pulled a sheet aside revealing that he was standing

28   on the bunk behind the sheet barricade, with towels on his head.  (*Id.*)  Plaintiff got down from

1   the bunk, walked to the cell door and turned around so that he could be cuffed through the food

2   port.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 31.)  As soon as Plaintiff surrendered, the

3   application of pepper spray stopped.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 32.)

4   Once cuffed, the officers opened the door and ordered Plaintiff to kneel so that they could

5   apply further physical restraints.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 33.)  Next, the

6   officers took Plaintiff to the shower next to his cell, but the water had been turned off due to

7   Plaintiff's flooding his cell.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 34.)  They immediately

8   escorted Plaintiff to the shower in the yard where he was decontaminated.  (*Id*.)  Licensed

9   Vocational Nurse Davis examined Plaintiff, checked his breathing with a stethoscope and

10  medically cleared him.  (Doc. 124-1, at p. 12; Doc. 124-4, DUF No. 35.)  Plaintiff was not

11  injured, could walk and talk and did not appear to be in any distress other than what typically

12  results from exposure to O.C. pepper spray.  (Doc. 124-1, at p. 13; Doc. 124-4, DUF No. 36.)

13  Plaintiff was given clean clothes and housed in a different cell: A41R-26 in the 4A SHU.  (Doc.

14  124-1, at p. 13; Doc. 124-4, DUF No. 37.)

15  Because of Plaintiff's assaults on the other officer and Defendant Scaife on September 12,

16  2007, he was found guilty of three counts of assault by a prisoner on a non-prisoner, two counts

17  of assault with a deadly weapon, and one count of possession of a weapon in Kings County

18  Superior Court on December 17, 2008.  (Doc. 124-1, at p. 10; Doc. 124-4, DUF No. 8.)  Also

19  because of these assaults, Plaintiff was found guilty of battery of a peace officer with a weapon

20  and assessed a forfeiture of 360 days of good-time credits at a prison disciplinary hearing on

21  April 21, 2009.  (Doc. 124-1, at p. 10; Doc. 124-4, DUF No. 9.)

22   ### 3.  <u>Legal Standards</u>

23  The Eighth Amendment prohibits those who operate our prisons from using "excessive

24  physical force against inmates."  *Farmer v. Brennan*, 511 U.S. 825 (1994); *Hoptowit v. Ray*, 682

25  F.2d 1237, 1246, 1250 (9th Cir.1982) (prison officials have "a duty to take reasonable steps to

26  protect inmates from physical abuse"); *see also Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th

27  Cir.1988), cert. denied, 490 U.S. 1012 (1989) ("prison administrators' indifference to brutal

28  behavior by guards toward inmates [is] sufficient to state an Eighth Amendment claim").  As

1  courts have succinctly observed, "[p]ersons are sent to prison as punishment, not *for*

2  punishment." *Gordon v. Faber*, 800 F.Supp. 797, 800 (N.D.Iowa 1992) (citation omitted), *aff'd,*

3  973 F.2d 686 (8th Cir. 1992).  "Being violently assaulted in prison is simply not 'part of the

4  penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834

5  (quoting *Rhodes*, 452 U.S. at 347).

6      Although the Eighth Amendment protects against cruel and unusual punishment, this does

7  not mean that federal courts can or should interfere whenever prisoners are inconvenienced or

8  suffer de minimis injuries. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (8th Amendment

9  excludes from constitutional recognition de minimis uses of force).  The malicious and sadistic

10  use of force to cause harm always violates contemporary standards of decency, regardless of

11  whether significant injury is evident.  *Id.* at 9; *see also Oliver v. Keller*, 289 F.3d 623, 628 (9th

12  Cir. 2002) (Eighth Amendment excessive force standard examines *de minimis* uses of force, not

13  *de minimis* injuries)).  However, not "every malevolent touch by a prison guard gives rise to a

14  federal cause of action." *Id.* at 9.  "The Eighth Amendment's prohibition of cruel and unusual

15  punishments necessarily excludes from constitutional recognition *de minimis* uses of physical

16  force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"

17  *Id.* at 9-10 (internal quotations marks and citations omitted).

18      When a prison security measure is undertaken in response to an incident such as in this

19  case, the question of whether the measures taken inflicted unnecessary and wanton pain and

20  suffering depends on "whether force was applied in a good faith effort to maintain or restore

21  discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v.*

22  *McMillian*, 503 U.S. 1, 4, 5-7 (1992).  Factors relevant to the analysis are the need for the

23  application of force, the relationship between the need and the amount of force that was used, and

24  the extent of the injury inflicted. *Whitley v. Albers*, 475 U.S. 312 (1986).  Other factors to be

25  considered are the extent of the threat to the safety of staff and inmates, as reasonably perceived

26  by the responsible officials on the basis of the facts know to them, and any efforts made to temper

27  the severity of a forceful response. *Id.*, at 321.  The infliction of pain in the course of a prison

28  security measure "does not amount to cruel and unusual punishment simply because it may

18

appear in retrospect that the degree of force authorized or applied was unreasonable, and hence unnecessary." *Whitley v. Albers*, *supra* at 319; *see also*, *Hudson v. McMillian*, 503 U.S. 1, (1992).  Prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-322 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1970).

### 4. <u>Analysis</u>

Defendants and Plaintiff's versions of this encounter vary drastically.  However, as the movants, Defendants have met their burden of showing that the incident upon to which Plaintiff alleges he was subjected, took place in response to his obstreperous activity of refusing to cuff-up after he stabbed and gassed an officer and stabbed Defendant Scaife.  Since Plaintiff would not submit to being placed in handcuffs and blocked the food-port, Defendant Cogdill's use of a broomstick to move Plaintiff away from the food-port so that it could be closed was reasonable. Further, Defendants have shown that they gave Plaintiff opportunity to voluntarily cuff-up before O.C. pepper spray was utilized and that they offered multiple opportunities for Plaintiff to voluntarily do so throughout the time that O.C. pepper spray was sprayed into his cell. Defendants have shown that O.C. pepper spray was utilized only as was necessary to gain Plaintiff's compliance.  Defendants have thus met their burden.

The burden thus shifts to Plaintiff to show that the force applied was unreasonable.  When viewed in opposition to Defendants' motion, Plaintiff's allegations in the First Amended Complaint fall short of establishing the existence of a triable issue of material fact on his excessive force claim against Defendants Cogdill, Scaife, Davis, and Quinones.

As to Plaintiff's allegations that Defendant Cogdill subjected him to excessive force when he stabbed Plaintiff multiple times with the sharp, broken, splintered end of a broomstick, it is not facially plausible that Plaintiff just stood at his cell door while Defendant Cogdill repeatedly stabbed him.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In his deposition Plaintiff testified that he was intentionally blocking the food-port to avoid getting sprayed.19 (Doc. 124-5, Plntf. Depo., 17:8-18:7.)  Plaintiff

1   further testified:  that Defendant Cogdill used the broomstick to push Plaintiff away from

2   blocking the food-port; that Defendant Cogdill "poked" him to move away from the food-port so

3   that they could spray pepper spray into Plaintiff's cell; and made no mention of being repeatedly

4   "stabbed" by Defendant Cogdill as he alleges in the operative pleading despite being asked to

5   explain the interaction.  (*Id.*, at 18:17-19:4.)  This testimony flatly contradicts the allegations of

6   his complaint.

7           At his deposition, Plaintiff testified that he was not injured by the broom poking him.

8   (Doc. 124-5, at 18:17-20:20.)  He testified, "So it wasn't like a real injury [like] I was bleeding or

9   whatever."  *Id.*  He stated, "he just kept poking me to get me away, to try to spray me some more,

10  I guess for cause and affect."  (*Id.* at 19:2-3.)  The evidence and medical records submitted by

11  Defendants show that Plaintiff did not sustain any stab or puncture wounds and that the only

12  "injury" noted after the incident was that Plaintiff's body was covered with and had been exposed

13  to pepper spray.  (Doc. 124-13.)

14          Plaintiff fares no better on his other allegation of excessive force against Defendants

15  Cogdill and Scaife for spraying him with pepper spray for over two hours while Defendants Davis

16  and Quinones watched.  (Doc. 11.)  At his deposition, Plaintiff testified that the officers pepper

17  sprayed him between "an hour and a half, hour and forty-five minutes, something like that"

18  during the cell extraction.  (Doc. 124-5, at 16:3-11, 19:18-25.)  However, the DVD recording of

19  the cell extraction was a total of thirty-nine minutes and three seconds—which also included the

20  introductions of all staff prior to beginning the extraction, the decontamination shower and the

21  time spent while Plaintiff underwent medical evaluation after the incident.  (Doc. 125.)  The DVD

22  provides further evidence that none of the bursts of pepper spray into Plaintiff's cell during the

23  extraction lasted for a full minute.  (*Id.*)  No reasonable factfinder could find in Plaintiff's favor

24  given the disparity between his allegations and the video of the actual events.

25          Finally, in his deposition testimony, Plaintiff admits that the circumstances that put the

26  entire chain of events of which he complains in action was his gassing of a correctional officer

27  and that, despite the apparent existence of evidence against Plaintiff on that charge sufficient to

28  support a conviction, Plaintiff did not feel that he needed to leave his cell shortly after the

incident when directed to do so.  (Doc. 124-5, at 13:2-14:20.)  Further, in his deposition Plaintiff

admits that he refused to leave his cell until he could not tolerate the pepper spray anymore—

despite the officers' orders to leave his cell several times before the cell extraction process began.

(*Id.*, at 13:2-7, 15:6-21, 16:19-25.)  Thus, according to Plaintiff's own deposition testimony,

Defendants' use of force was justified and reasonable given the legitimate penological interest of

safety and security issues raised by Plaintiff's failure to comply with orders to cuff up to prepare

to leave his cell.  When addressing whether prison officials' acts bear a rational relation to a

legitimate peonolgical interest, "substantial deference" must be accorded to the professional

judgment of administrators, "who bear a significant responsibility for defining the legitimate

goals of a corrections system and for determining the most appropriate means to accomplish

them." *Overton v. Bazzetta*, 539 U.S. 126, 131-132 (2003).   Thus, Plaintiff's allegations fail to

meet his burden in opposing Defendants' motion for summary judgment on his excessive force

claim.  As a result, the motion of Defendants Cogdill, Scaife, Quinones, and Davis for their use of

pepper spray to extract Plaintiff from his cell should be **GRANTED**.

### B. Qualified Immunity

Application of qualified immunity need not be addressed since summary judgment is

appropriate on the merits of Plaintiff's claims.

### IV. Conclusions and Recommendations

Accordingly, this Court finds that based on the undisputed facts presented in this case,

Defendants have met their burden to be awarded summary judgment on all of Plaintiff's claims

against them.

As set forth herein, the Court **RECOMMENDS**:

(1)    that Defendants, Bardonnex, Cogdill, R. Davis, Magana, Pratt, A.C. Quinones,

Scaife, and T.L. Williams are entitled to judgment as a matter of law such that

their Motion for Summary Judgment, filed on January 30, 2015, should be

**GRANTED**; and

(2)    that the Clerk of the Court be directed to enter judgment for the Defendants

Bardonnex, Cogdill, R. Davis, Magana, Pratt, A.C. Quinones, Scaife, and T.L.

1    Williams and against Plaintiff.

2    These Findings and Recommendations will be submitted to the United States District

3 Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within 30**

4 **days** after service of these Findings and Recommendations, the parties may file written objections

5 with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings

6 and Recommendations."  The parties are advised that failure to file objections within the specified

7 time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th

8 Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

9

10 IT IS SO ORDERED.

11    Dated:   __August 11, 2015__                    _____/s/ Jennifer L. Thurston__
                                                         UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                    22